**J.F. ALLEN COMPANY AND WILEY W. JACKSON COMPANY, A JOINT VENTURE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 578–87C.**

United States Claims Court.

Feb. 19, 1992.

Nicholas A. Pasciullo, Pittsburgh, Pa., attorney of record, for plaintiff.

George M. Beasley, III, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, D.C., with whom was the Asst. Atty. Gen., and Director David M. Cohen, attorneys of record, for defendant.

## OPINION

HORN, Judge.

### BACKGROUND

The plaintiff, J.F. Allen Company and Wiley W. Jackson Company, a joint venture, filed this action to recover from the United States alleged damages arising out of the joint venture's construction contract with the United States Army Corps of Engineers (Corps). The jurisdiction of this court is uncontested under 28 U.S.C. § 1491 (1988), and the Contract Disputes Act of 1978, 41 U.S.C. § 609 (1988). The issues described in this Opinion originally were presented to the court on the plaintiff's motion for partial summary judgement on what the parties have denominated the "section-skipping requirement," the defendants's motion for summary judgement on the whole case (the section-skipping requirement and the damages on the second issue presented, denominated the "low grout take" issue), and the defendant's alternative motion in limine to preclude the plaintiff from using the "total cost" method to calculate damages related to the low grout take issue. The plaintiff claims that the imposition of the section-skipping requirement, which is more fully defined below, constituted a constructive change or breach of contract. The defendant has conceded liability on the low grout take issue, but disputes the damages to which plaintiff might be entitled.

The case arises out of a contract executed between the Corps and the plaintiff for the construction of the Stonewall Jackson Lake Dam, West Fork River, Lewis County, West Virginia. Performance of the contract required the plaintiff to complete foundation drilling and grouting at the dam. The present dispute stems from the drilling and grouting operations performed by the plaintiff's subcontractor, Pennsylvania Drilling Company, Inc. (Penn Drilling).

In its complaint, the plaintiff alleges that: (1) contrary to paragraphs 5.1 and 5.1.2 of Section 20 of the plaintiff's contract with the Corps, authorized representatives of the Corps and the contracting officer issued orders prohibiting simultaneous drilling and grouting in adjacent one-hundred foot sections, which orders constituted a constructive change or, alternatively, a breach of contract, entitling the plaintiff to recover for the increased costs and lost profits associated with this alleged change in the drilling sequence; and (2) because of the low grout take, which occurred in performance of the contract, the plaintiff is entitled to an equitable adjustment, pursuant to the Differing Site Conditions and Variations in Quantity clauses in the contract.

After the plaintiff's motion for partial summary judgment, the defendant's motion for summary judgment and the defendant's alternative motion in limine had been briefed and argued, the plaintiff filed a motion for enlargement of time to file a motion for summary judgment on the issue of the low grout take. The plaintiff claims that it was prompted to file this motion by the discussion that had ensued at the oral argument. The defendant filed its opposition to plaintiff's motion for enlargement of time to file a motion for summary judgment, arguing that the plaintiff should not be allowed to raise new issues so far along in the proceedings, especially after oral argument had been held and post-argument briefs had been filed by both parties.

The plaintiff, however, was allowed to file a supplemental brief in opposition to defendant's motion for summary judgment, which essentially is a restyled version of the arguments the plaintiff would have made in a motion for summary judgment. In its supplemental brief, the plaintiff claims that as a matter of law, the contracting officer had not correctly computed the amount of damages the plaintiff was entitled to as result of the differing site conditions which resulted in the low grout take.

On November 28, 1989, the defendant filed its response to plaintiff's supplemental brief in which it stated that the plaintiff had "... finally raised a genuine issue of material fact as to whether it may be able to establish allowable costs in addition to those already paid." The defendant, there-

fore, requested that its motion for summary judgment on the issue of low grout take be withdrawn, without prejudice. The court, hereby, grants the defendant's request to withdraw its motion for summary judgment on the low grout take/differing site conditions issue. Accordingly, the issues remaining for the court's consideration are those involving the change encountered by the plaintiff in the drilling and grouting sequence (the section-skipping requirement), on which both parties have requested summary judgment, and the defendant's request for a ruling at this time to prohibit the plaintiff from using the total cost method to calculate damages.

After careful consideration of the briefs filed by the parties, the oral argument held on the cross-motions for summary judgment and the motion in limine, and for the reasons stated below: (1) the plaintiff's motion for partial summary judgement on the section-skipping requirement or alternative breach of contract claim is DENIED; (2) the defendant's motion for summary judgment on the section-skipping requirement is GRANTED; and (3) the defendant's alternative motion in limine is DENIED.

## FACTS

Based on the documentary evidence submitted by the parties, the facts of the case appear to be as follows. The plaintiff, J.F. Allen Company and Wiley W. Jackson Company, a joint venture, entered into a contract (No. DACW59–83–C–0053) with the United States Army Corps of Engineers (Corps) for the construction of the Stonewall Jackson Lake Dam, West Fork River, Lewis County, West Virginia. The contract executed by the parties contains the basic General Provisions found in construction contracts issued by the Corps (May 1983 Edition), e.g., General Provision 3, Changes, General Provision 4, Differing Site Conditions. The contract also contains the June, 1982 edition of the Variations in Estimated Quantities Subdivided Items.

A portion of the plaintiff's contract calls for the construction of a grout curtain beneath the dam.[1] The contract specifies that this grout curtain is to be constructed in accordance with Section 20 of the technical provisions of the contract entitled "Foundation Drilling and Grouting and Drainage Holes."[2] The plaintiff subcontracted with Crown Pressure Grouting Company to perform the drilling and grouting work required by the contract. Subsequently, it appears that the plaintiff entered into a replacement subcontract with Pennsylvania Drilling Company, Inc. (Penn Drilling). The present dispute stems from the drilling and grouting operations performed by Penn Drilling during the construction of the grout curtain.

Penn Drilling began drilling and grouting on January 6, 1986, and completed operations on June 4, 1986. The drilling and grouting work performed by Penn Drilling took place in a gallery, or tunnel, inside the dam. Pursuant to paragraph 5.1 of the technical provisions of the contract, drilling and grouting was to be completed "by zones, using the split spacing, stage grouting method as described herein." Furthermore, the technical provisions specify that the dam gallery was to be divided into sections no longer than one-hundred feet in length. Specifically, paragraph 5.1.2 of Section 20 of the contract specifications provides, "[a] section is a reach along the grout curtain, not more than 100 feet in

---

1. A grout curtain is constructed by drilling and grouting a row of holes, spaced ten feet apart, across the length of the dam. The purpose of the grout curtain is to effect a cement barrier by filling in the cracks and voids in the foundation rock so as to make the rock an impervious and continuous barrier against water seepage.

2. The program contemplated for drilling and grouting is outlined in paragraph 1.2 of Section 20 of the technical provisions of the contract with the minimum quantity of drilling being represented by grout holes on five-foot centers. Paragraph 1.2 also states:

> * * * The amount of drilling and grouting will be determined by the Contracting Officer. The amount of drilling and grouting which actually will be required is unknown, and will be governed by conditions encountered as work progresses. The Contracting Officer reserves the right to require drilling and grouting operations at any location within the limits of the work area. * * *

length." Paragraph 5.1.2 also states that, "[g]routing operations will not be permitted in a section at the same time drilling in that section is in progress."

Upon mobilization at the project site, Mr. Jim Adams, Job Superintendent for Penn Drilling, contacted Mr. Warren David Nugen, Project Geologist for the contract.[3] In a signed declaration submitted to the court, Mr. Nugen described himself as the project geologist, assigned to the Stonewall Jackson Lake Project Office, responsible for supervising placement of the grout curtain in the foundation of the dam. Furthermore, Mr. Nugen described himself as being responsible for insuring that the grout cutoff was effective and met the design intent of the contract. The parties have stipulated to the fact that Mr. Nugen's supervisory duties included directing the drilling and grouting program of the contract. Moreover, although Mr. Nugen directed the sequence of the hole drilling, it was not his job and he did not direct the actual performance of the drilling operation.

Prior to the beginning of drilling and grouting operations at the dam, Mr. Nugen developed a drilling and grouting plan to be implemented in order to insure that the grout cutoff was effective and met the design intent of the contract. The parties have stipulated that Mr. Nugen was the Corps' authorized representative, acting within the scope of his authority when he prepared the drilling and grouting plan. The parties have also stipulated that the plan prepared by Mr. Nugen did not have to be authorized or affirmed by anyone else. According to Mr. Nugen, he had no authority to make changes to the contract or order work performed which was outside the scope of the contract. The Corps directed Penn Drilling to perform the drilling and grouting work according to the contract specifications, as implemented by the drilling and grouting plan Mr. Nugen prepared and authorized.[4]

The drilling and grouting plan prepared by Mr. Nugen divided the dam into eight sections as follows:

/4–R/ /3–R/ /2–R/ /1–R/ /1–L/ /2–L/ /3–L/ /4–L/ [5]

Under the plan, the contractor was required to skip at least one section between drilling and grouting operations, i.e., when the drilling contractor completed first stage holes in section /1–R/, the plan required the contractor to move one-hundred feet away, skipping section /2–R/, to begin first stage holes in section /3–R/. Grouting would then commence in section /1–R/. The plan did not provide for drilling and grouting simultaneously in adjacent sections.

Early during the drilling and grouting operations, the contractor orally notified the Corps Resident Engineer, Mr. William Woodburn, that the set up and moving time involved in the section-skipping requirement of the plan was causing difficulties with the work. The basic equipment for drilling grout holes consists of drills, drill bits, drill steel, tools, water source, and a power supply. Each time Penn Drilling's workers completed a section, the section-skipping requirement imposed by the plan required the workers to disassemble the drill into its three components, and move these components one at a time, as well as tools, boxes of drill steel, and drill bits,

---

**3.** The parties have stipulated that Warren David Nugen was the Project Geologist for contract DACW59–83–C–0053. In the index to the appendix to the defendant's motion for summary judgment and alternative motion in limine, there is a listing for "Position Description of David Nugen." That document included in the appendix, and referred to in the index as "Position Description of David Nugen," does not clearly show that it is the position description for Mr. Nugen. Rather, the document included in the appendix is a numbered job description with several lines crossed out and, although barely readable, Mr. Nugen's name hand-written in the upper right hand corner of the page.

**4.** The parties have stipulated to the fact that the Corps has traditionally retained detailed control over grouting operations as they are performed. Furthermore, the parties have stipulated that work at the jobsite is generally directed by the contracting officer or his authorized representative.

**5.** "R" and "L" are used to show the right and left sides of the dam, as depicted in the "West Fork River, Foundation Treatment Grouting Plan, Elevation and Sections," included in plaintiff's appendix.

across the length of the section adjacent to where they had just completed work, to the next section. The plaintiff alleges that each time Penn Drilling was required to move its equipment a section or more, this move resulted in the loss of a half to one full work shift and interfered significantly with grouting operations. The plaintiff asserts that there would not have been significant down-time had Penn Drilling been permitted to drill the holes sequentially from one end of the dam to another.

The plaintiff asserts that under a "fair and reasonable reading of the specifications," Penn Drilling should have been allowed to drill each hole in sequence, followed immediately at a distance of one-hundred feet by grouting operations. The section-skipping requirement imposed by Mr. Nugen's drilling and grouting plan made it impossible for Penn Drilling to drill and grout sequentially, as the plaintiff alleges Penn Drilling had planned to do when it submitted its bid. Therefore, because the section-skipping requirement of Mr. Nugen's drilling and grouting plan forced Penn Drilling to jump back and forth between different sections of the dam in order to complete the work, the plaintiff claims that the section-skipping requirement constituted a change in the contract specifications and that the Changes clause of the contract permits both the contractor, the joint venture of J.F. Allen Company and Wiley W. Jackson Company, and its subcontractor, Pennsylvania Drilling Company, Inc., to receive an equitable adjustment for the resulting additional costs.

After Mr. Nugen instructed Penn Drilling to follow the drilling and grouting plan, no representative of Penn Drilling advised Mr. Nugen that the company intended to take the matter of the drilling and grouting plan to the contracting officer, and Mr. Nugen was not made aware of any complaints by the plaintiff or Penn Drilling with respect to his plan.[6] Furthermore, Col. Robert B. Wilson, the contracting officer at the time of contract performance, stated in his signed declaration:

> No individual, representative, or employee of J.F. Allen Company and Wiley N. Jackson Company, a Joint Venture, or from Pennsylvania Drilling Company, Inc., ever questioned me or asked me if it were necessary to follow Warren David Nugen's instructions relative to any drilling and grouting sequence. Further, I received no oral or written complaints from such representatives that Plaintiff or its subcontractor was being required to follow a drilling and grouting sequence not required by the terms of the contract.

By letters dated November 25, 1986, and December 12, 1986, and certifications dated January 19, 1987, and March 19, 1987, the plaintiff submitted a claim on behalf of Penn Drilling in the amount of $469,868.98 to Col. Robert D. Brown III, the contracting officer who replaced Col. Wilson on the Stonewall Jackson project.[7] In the claim

---

**6.** Although the subcontractor, Penn Drilling, submitted a written plan for progressive drilling in adjacent sections, its plan was not submitted to the Corps until the administrative claim was submitted, which was not until after all drilling and grouting work had been completed. Moreover, this plan, the contracting officer wrote, "ignored the definition of section as per the specifications and considered the limits of the whole zone as one section." Based upon his review of the Penn Drilling plan, the contracting officer felt that its plan "would not have been acceptable."

**7.** The breakdown of the claim presented to the contracting officer is as follows:
(1) An amount of $182,452.25 was claimed as a result of the Corps allegedly requiring work conditions contrary to those identified in the specifications, refusing to permit Penn Drilling

to drill and grout in a rational sequence, and for extensive delays in the washing out of grout holes. The plaintiff claimed this amount under the Differing Site Conditions clause or under a constructive change theory.
(2) An amount of $109,749.00 was claimed for placing cementitious grout under the Differing Site Conditions clause as a result of a grout underrun, which was more than 80 percent below expected levels.
(3) An amount of $31,090.50 was claimed for lost profit on the unused bags of cement as a result of the grout underrun. This portion of the claim was calculated under the Variations in Estimated Quantity clause.
(4) An amount of $45,000.00 was claimed to cover fees for consultants, in-house expenses and legal fees. These miscellaneous expenses were allegedly incurred in discussion of job

submitted to the contracting officer, the plaintiff asserted (1) that the low grout take associated with the performance of the contract entitled the plaintiff and its subcontractor to an equitable adjustment pursuant to the contract's Differing Site Conditions clause and the Variation in Estimated Quantity clause; and (2) that the Corps' refusal to let Penn Drilling drill and grout simultaneously in adjacent one-hundred foot sections was a constructive change and/or breach of contract because Corps' representatives required work conditions contrary to those identified in the contract specifications.

On May 15, 1987, the contracting officer reviewed the plaintiffs' claim and rendered a decision on the merits of the claim. The contracting officer recognized that a partial equitable adjustment pursuant to the Differing Site Conditions Clause was due the plaintiff as a result of the low grout take, which had an underrun of approximately 82 percent. The contracting officer determined that the plaintiff was entitled to an equitable adjustment of $38,450.30. The remaining issues were considered on their merits and denied.

In reviewing the section-skipping portion of the plaintiffs' claim, the contracting officer wrote that, "[w]ith respect to the method of drilling that was followed, it is noted that the drilling and grouting specifications for this contract are for a well-defined stage grouting process." The contracting officer defined the plaintiff's section-skipping claim as being, "based upon the Corps not permitting you to perform the job using the stop grouting procedure." Such procedures, the contracting officer wrote, "are not a part of your contract specifications." According to the contracting officer, the drilling and grouting plan prepared by the Corps allowed the contractor the flexibility to perform the work in a manner that was permissible given the one-hundred foot and twenty-four hour grouting restric-

tions under paragraph 5.4.2 of Section 20. In denying the claim, the contracting officer wrote that the drilling and grouting plan prepared by the Corps, "cannot be construed as a constructive change."

## DISCUSSION

Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language.[8] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c) and Fed.R.Civ.P. 56(c). RUSCC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1969); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Assn. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

■ As stated in *Webster University v. United States*, 20 Cl.Ct. 429 (1990):

An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987), while the materiality of a fact is determined by reference to applicable legal standards. *Id.*, 833 F.2d at 1567.

activities, coordination of documentation and preparation of the claim.
(5) An amount of $101,577.23 was claimed for markup and support by the plaintiff.
**8.** Since RUSCC 56(c) is closely patterned upon Fed.R.Civ.P. 56(c), precedent under the Fed.

R.Civ.P. is relevant to interpreting RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtfeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

*Id.* at 432 (emphasis deleted). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

Moreover, the facts presented must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.,* 398 U.S. at 147, 90 S.Ct. at 1602. If the moving party has carried its initial burden of showing that there is no genuine issue of material fact, then the nonmoving party bears the burden to present "specific facts showing that there is a genuine issue for trial." RUSCC 56(f); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Uniq Computer,* 20 Cl.Ct. at 228 (stating that the non-movant "must proffer countervailing evidence sufficient to create a genuine issue of material fact"); *and Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 89 (1989) (stating that the party opposing the motion must "prove by sufficient evidence that a genuine issue of material fact positively remains").

When making a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a sufficient disagreement to require submission to fact finding or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Lib-*

*erty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356. If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed. Cir.1985); *and H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court added an additional provision to the long standing summary judgment guidelines outlined above when it indicated that the initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2553; *see also Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is then on the nonmoving party to present evidence in support of its case and show that a genuine factual dispute exists by making a showing sufficient to establish the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.,* 20 Cl.Ct. at 679. The logic behind this addition is simple, if under no scenario can the nonmoving party present the necessary evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceeding. Under Rule 56, the motion for summary judgment may be made by the

moving party and succeed, whether or not accompanied by affidavits and other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and other admissions, in order to show that a genuine issue for trial exists. *Celotex v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. The type of evidence provided by the party opposing summary judgment need not meet the standards for admissibility at trial. The nonmovant, however, must produce evidence beyond the mere pleadings to survive the summary judgment motion and proceed to trial. *Id.*

■ After careful review of the pleadings, and consideration of the oral arguments presented by both parties, the court finds that the issue of whether the plaintiff is entitled to an equitable adjustment as a result of the implementation of the section-skipping plan implemented by the Corps can be resolved on summary judgment. There exists no dispute as to any of the material facts surrounding the issue. The only dispute left to be settled is a legal one: whether, given the established facts, and under the applicable law, the plaintiff is entitled to an equitable adjustment for costs incurred as a result of implementation of the section-skipping requirement.

■ In order to recover under the changes clause of a government contract, either for an express or constructive change, the government representative, by actions or deeds, must have required the contractor to perform work which was not a necessary part of the contract. Furthermore, that government representative must have had the requisite authority to make changes to the contract. *See Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 355 (1987), *aff'd*, 848 F.2d 1245 (Fed.Cir.1988). A general rule for resolving disagreements between the government and the contractor under the changes clause has been stated as follows:

> Where as a result of the Government's misinterpretation of contract provision a contractor is required to perform more or different work, or to higher standards, not called for under its terms, the Contractor is entitled to equitable adjustments pursuant to the Changes Article....

John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 325 (2d ed.1986).

On May 15, 1987, the contracting officer issued his decision on the claims at issue. In his decision, the contracting officer carefully analyzed the claims presented by plaintiff and granted certain limited portions of the plaintiff's claim under the low grout take modification, but denied the balance of the plaintiff's claims. The following portions of the contracting officer's well-reasoned decision are relevant to this court's review in the instant case.

> With respect to the method of drilling that was followed, it is noted that the drilling and grouting specifications for this contract are for a well-defined stage grouting process. In essence, your claim is based upon the Corps not permitting you to perform the job using stop grouting procedure. Such procedures are not a part of your contract specifications.
>
> The specifications, under paragraph 5, "Definition of Procedures for Drilling and Grouting" defined the manner in which the work was to be performed. The work was to be done by section to full depth of the first zone and then the second zone. Paragraph 5.2.9 indicates that upon completion of the section to the full depth of the second zone, then other sections along the grout curtain were to be grouted in a like manner. Upon completion of drilling and grouting a stage in a section, you were permitted to drill and grout in alternate sections to avoid the 24 hour and 100 foot restrictions imposed by paragraph 5.4.2.[9] Had

---

**9.** Section 5.4.2 of Section 20 of the Contract provides:

5.4.2 Second Stage. After all first stage grouting in any section has been completed, as specified above, the Contractor shall pro-

you requested, at the time of performance of work, permission to drill and grout in the adjacent sections, such permission would have been granted, subject to the 24 hour and 100 foot limitations. These limitations would have added greatly to both your time and cost of performance of the work.

Your proposed plan for progressively drilling from point A to point B was not submitted until some five and one-half months after the work was completed. This plan ignored the definition of section as per the specifications and considered the limits of the whole zone as one section. It failed to handle treatment of the overlapping grout curtain beneath Monoliths 9 and 10 and did not address the inefficiencies and down times that would result at various times. Inefficiencies and down time in your plan would arise due to the staging requirement, completion of all primary holes to zone depth prior to beginning secondary holes, completion of all secondary holes to zone depth prior to beginning zone 2, and completion of all primary and second holes to full zone 2 depth prior to beginning tertiary holes. Additionally, exploratory drilling would be delayed until zone 2 was essentially complete. Furthermore, drain hole drilling would not be permitted until the grout curtain was completed which would throw further delays and interruptions into your plan. Based upon this review, it becomes quite apparent that your plan would not have been acceptable.

Drilling and grouting in alternate sections has been standard stage grouting procedures on Federal Government Agency Projects in order to eliminate time and distance restrictions so as not to delay the work. With the manner in which the Corps permitted you to perform by sections, you were never without a place to drill. Upon completion of the work on the right side of the Dam, you were permitted to perform exploratory drilling to check the effect of grouting for the grout curtain which thus permitted you to begin drain hole drilling at a much earlier time. This method also permitted an orderly manner of drilling and grouting of the overlapping right and left side grout curtains under Monoliths No. 9 and No. 10.

Therefore, with respect to the manner in which the work was performed, the Corps allowed you to do the work in a manner than was permissable, given the 100 foot and 24 hour grouting restrictions under 5.4.2. This cannot be construed as being a constructive change.

The court agrees with the carefully crafted decision issued by the contracting officer in this case. In addition, on its face, paragraph 5.4.2 of Section 20 does not discuss section-skipping between drilling and grouting operations. The twenty-four hour and one-hundred foot limitation described in 5.4.2 concerns time and distance restrictions on drilling from hole to hole and not on drilling and grouting in an entire section. The primary holes are spaced ten feet apart, ten to a section. As long as the contractor drilled at least ten holes away from grouting operations during the twenty-four hour period, it would remain one-hundred feet away from a hole, and satisfy the details of the specifications of paragraph 5.4.2.

Another contract provision which imposes a drilling and grouting spacing requirement is paragraph 5.1.2 of Section 20, which states:

5.1.2 A section is a reach along the grout curtain, not more than 100 feet in length. Grouting operations will not be permitted in a section at the same time drilling in that section is in progress.

ceed, when so directed, with second stage drilling and grouting in accordance with the procedure outlined herein, but in no case shall the deepening of any hole preparatory to grouting be commenced before a minimum period of 24 hours has elapsed since completion of the previous stage of grouting at that hole; nor shall second stage grouting be conducted within a distance of approximately 100 feet of any hole in which a previous stage of grouting has been completed until the grout in such previous stage hole has set for a period of 24 hours. Grouting at subsequent stages shall conform to the same requirements as to minimum time and distance.

Insofar as practicable, the grout curtain will be subdivided into sections in a manner which will facilitate the Contractor's operations.

This contract provision only requires that drilling and grouting may not be conducted simultaneously within one section. Paragraph 5.1.2 is silent regarding drilling and grouting in adjacent sections.

In both the defendant's brief in support of its motion for summary judgment and in its post argument brief, it cites to several paragraphs in Section 20 of the contract which, the defendant alleges, express the Corps' reservation of control over the drilling and grouting sequence of the contractor. A few of the Section 20 paragraphs relied on by the defendant are set out below:

1.2 *Program.* * * * The amount of drilling and grouting will be determined by the Contracting Officer. The amount of drilling and grouting which actually will be required is unknown, and will be governed by conditions encountered as the work progresses. The Contracting Officer reserves the right to require drilling and grouting operations at any location within the limits of the work area. * * *

1.4 *Procedures.* Grouting mixes, pressures, the pumping rate and the sequence in which the holes are drilled and grouted will be determined in the field and shall be as directed.

4.1 *General.* Holes for grouting or exploration as determined by the Contracting Officer, shall be drilled at the locations, in the direction and to the depths shown on the drawings or as directed by the Contracting Officer. * * * The location of succeeding sets of (tertiary) holes, if necessary as determined by the Contracting Officer, shall be determined by the split spacing method as defined in paragraph 5.1.4. The number of succeeding sets of holes will be increased, progressively, by the split spacing method as deemed necessary by the Contracting Officer until the amount of grout used indicates that the foundation is tight. * * *

4.5 *Exploratory Nx Hole Drilling.* The Contractor, as directed by the Contracting Officer, shall perform such exploratory drilling as may be required to determine the condition of the rock prior to grouting or the effectiveness of the grouting operations after grouting. * * *

5.1.1 Zone. A zone is a predetermined partial depth of curtain. The first zone extends 30 feet from a baseline determined by factual foundation excavation and the second zone extends approximately 20 feet downward from the bottom of the first zone. It is anticipated that hole spacing will average 10 feet in the first zone and 10 feet in the second zone. However, these spacings will be varied in accordance with conditions encountered and as directed. * * *

5.2.2 The holes thus drilled shall be washed and pressure tested, and then grouted, except that when pressure testing indicates a relatively tight hole, the Contracting Officer may direct that the grouting of that hole be omitted for that stage and the hole be left open for drilling and grouting of the next stage.

In addition paragraphs 5.2.4, 5.2.5, 5.2.7, 5.2.8, 5.2.9, 5.3, 5.4.1, 5.4.2, 5.5, 5.6, 5.6.1, 5.6.2, also cited to by the defendant, clearly address the issue of contractor's reservation of direction during contract performance.

In its post-argument brief, the defendant asserts that when the pertinent provisions of the contract are considered, the essence of Section 20 of the contract is to give the Corps, not the contractor, almost complete control over the drilling and grouting work as it progressed. The court agrees. Moreover, the defendant asserts that these provisions are an example of the Corps' express reservation of the right to require drilling and grouting in any part of the work area and that, therefore, the plaintiff is not entitled to an equitable adjustment.

The court finds that the provisions in Section 20 of the contract, which set out the scope and work procedures for the foundation drilling, grouting and drainage holes, clearly indicate that the Corps re-

tained an enormous degree of control over the drilling and grouting methods to be used by the contractor. Of particular note is Paragraph 1.2 of Section 20, which states that "[t]he Contracting Officer reserves the right to require drilling and grouting operations at any location within the limits of the work area," and paragraph 1.4 which states that "[g]routing mixes, pressures, the pumping rate and the sequence in which the holes are drilled and grouted will be determined in the field and shall be as directed." In addition, paragraph 4.1 adds that "[h]oles for grouting or exploration as determined by the Contracting Officer, shall be drilled at the locations, in the direction and to the depths shown on the drawings or as directed by the Contracting Officer." These contract provisions indicate that the plan authorized by Mr. Nugen was well within the confines of the contract, and did not constitute a change to the contract.

Although in the instant case, the text of the contract cannot be reasonably interpreted to preclude drilling and grouting using the plaintiff's one-hundred foot sequential method, the contract clearly indicates that sequencing shall be determined in the field and performed as directed by the government. The plaintiff's interpretation of the contract, that it should have been permitted to drill and grout without skipping a section, although possibly within the parameters of the contract language, was not given an absolute imprimatur by the contract as the only way to proceed. It is clear to the court that the government did not deviate from the contract and scope of work envisioned in the technical specifications, and that in the instant case the contractor was on notice that the sequence of operations under the contract was to be performed at the discretion of, and under the direction of the government officials. As stated above, the contract makes it clear that under paragraph 1.4 of Section 20 of the contract, decisions regarding the

sequence of hole drilling and grouting were to be determined in the field as directed by the government's representatives and, not necessarily, by the contracting officer.

Furthermore, there is no evidence that the plaintiff or its subcontractor, Penn Drilling, advanced their current interpretation of the contract, on which they base their claim entitling them to compensation for an express or constructive change, prior to the submission of the administrative claim. The plaintiff's failure to properly protest the drilling and grouting plan at the time they were directed to follow it shows acceptance of the direction and presumptive acknowledgment that Mr. Nugen was acting within the scope of his authority, and within the terms of the contract, when he developed and implemented the drilling and grouting plan.[10] Additionally, there is no evidence that Penn Drilling or the plaintiff ever communicated their alleged dissatisfaction with Mr. Nugen's direction on the drilling and grouting specifications to the contracting officer.

Even, however, if the court were to determine that Mr. Nugen had issued directions which went beyond the terms of the contract, it is well established in law and in practice that parties entering into contracts with the United States Government understand that only an authorized government representative, and generally only the contracting officer, has the requisite authority to authorize changes to the contract which obligate the government to pay additional money for performance. In such cases the contractor must show that its interpretation of the contract was correct, that there was a constructive change order issued and that the person ordering the alleged change had the authority to act for the contracting officer, or the contractor must show that the orders issued were ratified by a contracting officer. *See,* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 330 (2d ed. 1986). The Claims Court has followed

---

**10.** The position description included in the appendix to the defendant's motion for summary judgment describes the geologist's duties with respect to drilling and grouting as "supervise placement of grout curtains" and "[d]ecides drilling pattern." Moreover, paragraph 1.4 of Section 20 specifically states that, ". . . the sequence in which the holes are drilled and grouted will be determined in the field and shall be as directed."

this doctrine closely. In *Calfon Constr. Inc. v. United States*, 17 Cl.Ct. 171 (1989), the court stated:

> To recover under the contract's changes clause on the basis of a constructive change—for work beyond that required by the contract, but without a formal change order—the contractor must show that the requirements of the contract were enlarged and that the additional work was not volunteered, but was ordered by a government officer having the requisite authority.

*Id.* at 177 (citing *Len Co. & Assoc. v. United States*, 181 Ct.Cl. 29, 38–39, 385 F.2d 438, 443 (1967)). Similarly, the court in *IBI Sec. Service, Inc. v. United States*, specified that contractors may not recover increased costs unless they result from additional work beyond the minimal standards required by the contract, and that the work was ordered by the words or deeds of contracting officials. 19 Cl.Ct. 106, 111 (1989), *aff'd*, 918 F.2d 188 (Fed.Cir. 1990). Therefore, even if the section-skipping requirement could be read to effectively change the terms of the contract, in order to recover, the plaintiff would still have to show that Mr. Nugen, the government official who ordered the section-skipping requirement had the requisite contracting authority to issue a change to the contract which obligated the government to pay additional money under the contract.

In his declaration, Mr. Nugen specifically states that he did not have authority to make changes to the contract or to order work performed outside the scope of the contract. Mr. Nugen was the Project Geologist at the Stonewall Jackson Lake Dam. In the joint stipulation of uncontroverted facts, the parties agree that Mr. Nugen was responsible "... for the coordination of the drilling and grouting program of the contract" and that he "was authorized to prepare the Drilling and Grouting Plan utilized in Contract DACW59–83–C–0053." These stipulations indicate only that Mr. Nugen had authority to direct the plan within the confines of the contract at issue.

The plaintiff has failed to present any evidence demonstrating Mr. Nugen's authority to order an actual change order to the contract which would obligate the government to pay additional contract costs, nor has the plaintiff offered any evidence to indicate that the contracting officer ratified Mr. Nugen's directions.

Therefore, it is clear to the court that the section-skipping requirement appears not to have constituted a change to the terms of the contract. But, even if the plaintiff could successfully urge that such was the case, Mr. Nugen did not possess the requisite authority to order a change to the contract or to obligate the government to pay additional monies. Moreover, the drilling and grouting plan designed by Mr. Nugen pursuant to the terms of the contract, and implementation of that plan, does not constitute a breach of the contract as the plaintiff alleges. The court concludes, therefore, that the defendant's motion for summary judgment on the section-skipping claim must be GRANTED.

*Motion in Limine—Total Cost Measure of Damages*

In addition to its motion for summary judgment on the section-skipping claim, the defendant has also filed an alternative motion in limine claiming that the plaintiff, as a matter of law, should not be allowed to rely on the "total cost" method of recovery to compute damages.[11]

The total cost method is not favored and will not be used if there is another more reliable method available to establish cost. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 193, 351 F.2d 956, 965 (1965). The principal objection to this method of calculating an equitable adjustment is that, if used improperly, it can reimburse a contractor for losses not necessarily related to the reason for the adjustment in the first place. Nevertheless, the use of the total cost approach is not prohibited. *Boyajian v. United States*, 191 Ct. Cl. 233, 423 F.2d 1231 (1970). Certain safeguards have, however, been established by the courts when it is applied. In *WRB*

---

**11.** The total cost method computes damages by calculating the difference between actual expenses and bid or estimated costs. *See WRB Corp. v. United States*, 183 Ct.Cl. 409, 426 (1968).

*Corp. v. United States*, 183 Ct.Cl. 409, 426 (1968), the Court of Claims laid down the following guidelines for the use of the total cost method:

> The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

The defendant claims that the plaintiff cannot meet prerequisite (2) of the *WRB* test, because Penn Drilling's bid was clearly unrealistic. The defendant asserts that Penn Drilling's bid to plaintiff, the joint venture, J.F. Allen Company and Wiley W. Jackson Company, in August, 1985 was unreasonably low in view of the fact that the fair and reasonable cost estimate, which Penn Drilling furnished to the government in June of 1983, was significantly higher than the amount Penn Drilling agreed to accept from the plaintiff in 1985.[12]

The plaintiff, relying on paragraphs 6–8 of the affidavit of Mr. Thomas B. Sturges, President of Penn Drilling, argues that the bid was not unrealistic. The plaintiff contends that the bid cannot be compared with the June, 1983, reasonable cost estimate because the 1983 estimate was submitted for the sole purpose of creating a budget for the contract. Mr. Sturges, in his affidavit, claims that Penn Drilling's normal practice when asked for budget amounts, is to provide high estimates in order to ensure that sufficient money is budgeted for the drilling and grouting program. The defendant, in its reply brief, argues that paragraphs 6–8 of Mr. Sturges' affidavit fail to comply with RUSCC 56(f), since they do not show that Mr. Sturges has personal knowledge of the information included in the affidavit. The defendant contends that paragraphs 6–8 of Mr. Sturges' affidavit are based on "rank hearsay," namely, on alleged oral statements made to Mr. Sturges by Mr. Jack Woleslagle, the former Vice–President and Estimator for Penn Drilling, who furnished the quotations to the Corps.

RUSCC 56(f) provides, in pertinent part, as follows:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

■ RUSCC 56(f) sets out three tests to determine whether the contents of an affidavit supporting or opposing a motion for summary judgment may be considered by the court. First, the party's affidavit must be made on "personal knowledge." Affidavits based on reports and the statements of others, without personal knowledge cannot be considered. Second, the statements set forth in the affidavit must be facts that would be admissible in evidence. Conclusory statements, without factual support, are not admissible and do not comply with rules of this court. Third, the affidavit must show affirmatively that the affiant is competent to testify to the matters stated in the affidavit under RUSCC 56(f). *MacMurray v. United States*, 15 Cl.Ct. 323, 331 (1988) (citations omitted). If an affidavit does not meet all three of the above tests, it has no value to the court when deciding a summary judgement motion. In applying Rule 56(f), however, the court must only disregard the inadmissible portions of the affidavit in ruling on the motion. *Id.* at 331–32.

■ The court agrees that certain portions of paragraphs 6–8 of the Sturges'

---

12. At oral argument, in responding to the court's observations regarding the defendant's motion in limine, the defendant's counsel described its motion as "a long shot." The defendant's counsel went on to say:

> It may not be established to the Court's satisfaction, that this contractor had made an un-

reasonably low bid, and is trying to make itself whole here. Whether we can establish it on Summary Judgment, all we can establish is that they did submit a lower bid for the exact same contract, not a bid but an estimate to us, and they are challenged to why that wasn't reliable.

affidavit are inadmissible, for example, the first sentence of paragraph 6, which describes a conversation to which Mr. Sturges was not a party. However, the court finds that the admissible portions of Mr. Sturges' testimony, regarding the general practices of Penn Drilling and their approach to the contract at issue, provide enough evidence to demonstrate a genuine factual dispute concerning whether or not the plaintiff's bid was reasonable. For example, the evidence presented demonstrates a factual dispute to the court concerning the purpose of the numbers used in the plaintiff's 1983 estimate.

The law is clear that an issue cannot be resolved on summary judgment unless there exists no genuine issue of material fact. RUSCC 56(c). The purpose of the 1983 estimate is a dispositive fact in determining whether the plaintiff's 1985 estimate was realistic. Since the plaintiff's 1985 bid must be realistic in order for the plaintiff to use the total cost method for calculating damages, *see WRB Corp. v. United States*, 183 Ct.Cl. at 426, the factual dispute concerning the purpose of the 1983 estimate is a material one. Therefore, at this stage of the proceedings, although the court remains skeptical that damages awarded to the plaintiff, if any, should be computed utilizing the total cost method for calculating damages, the defendant's alternative motion in limine is premature and is, therefore, DENIED, subject to renewal at a later date.

## CONCLUSION

For the reasons discussed above: (1) the plaintiff's motion for partial summary judgment on the section-skipping requirement or alternative breach of contract claim is DENIED; (2) the defendant's motion for summary judgment on the section-skipping requirement is GRANTED; and (3) the defendant's alternative motion in limine is DENIED.

IT IS SO ORDERED.